We turn now to the third case of the morning, Appeal No. 25-3220, Akeel & Valentine v. Napleton, et al. And we welcome to the podium, Attorney Kerlin. Yes, Attorney Simpkins. Apologies. Good morning, and may it please the Court, Your Honors. Samuel Simpkins, appearing for appellant. I intend to reserve three minutes for rebuttal. The District Court dismissed this case on public disclosure grounds. After airing in three important ways. First, by finding that a vague news article clearly established that Eddie Napleton had control of 37 specific dealerships. Second, by finding that unrelated and innocuous bits of information is substantially the same as a detailed and factually supported fraud allegation. And third, by holding that Relator not only did not add anything of material value, but never could add anything of material value. The public disclosure bar lays out a three-prong analysis. The first prong asks whether all of the essential elements of the fraud were clearly established by the disclosure material. The parties agree on two of the essential elements here. And the only real dispute on this point is whether the element that Eddie Napleton was an associate of the borrowed defendants. Appellees point to a single news article that says that he helps oversee, quote, roughly 75 franchise dealerships. Plainly, the disclosure material does not identify Eddie Napleton as an associate. So appellees argue that it can be inferred from that. But this court in cause of action held that if an equally plausible non-fraudulent inference can be drawn from the public disclosures, then the bar does not apply. And here, at least two equally plausible inferences can be drawn from the disclosure material. First, the phrase helps oversee in the context of describing Eddie Napleton's role at the parent company, Napleton Auto Group, implies that he helps run his dad's parent company. Not that he exercises direct management control over the discreet dealerships. And second, on its face, the article describes a franchise relationship between a national brand and dealerships. Now, on that point, I know there may have been some confusion in the briefing. Appellees say that we are now arguing that it actually is, in fact, a franchise relationship. That's not what we're arguing. We're arguing simply that, taken at face value, the disclosures mention franchise dealerships. Maybe to an industry insider, it's clear and plain and obvious that this denotes a relationship between car manufacturers and dealerships. But Napleton Auto Group is a national brand. And there are, in fact, dozens of Napleton dealerships that operate under that brand that are outside of the corporate umbrella of Napleton Auto Group. So to say vaguely that he helps oversee roughly 75 franchise dealerships is a far cry from being able to identify 37 specific dealerships that he, in fact, exercises control over. There may be overlap, but oversight is not the same as control. The SBA regulations don't define control, and they don't define oversight. But within the same chapter and same section, we see both of those words used. The definition of associate has three categories. The first focuses more on statuses, owner, director, officer. And then the prong that we've mostly briefed on, control, is a functional test. And it doesn't describe – Mr. Simpkins, can I ask you a couple of questions about that? Of course. First of all, in your – you say that oversight doesn't equal control. And yet in your complaint, the allegations are that he was directly overseeing, in charge of overseeing. The complaint itself uses the word overseeing or oversight. So how do you explain that anomaly? Yes, we explain it, Your Honor, by saying that control is a more specific element than oversight. So somebody who controls would also be found to be overseeing. But overseeing does not lead to the direct logical consequence – the direct logical conclusion of control. And that's – So what you're saying is your allegations on page 96 and 97 don't allege control. Not at all, Your Honor. We're saying that taken together – Well, because, I mean, it says that he was tasked with overseeing. He was charged with overseeing the dealerships on a national scale. You're saying oversight doesn't equal control. And so I guess under that theory, the allegations in 96 and 97 are insufficient to establish control. Your Honor, if taken just those two paragraphs, perhaps, but taken as a whole, the complaint shows a detailed structure of specific control actually exercised. From two deposition transcripts of private litigation that was not considered public under the False Claims Act, sworn declarations, arrest affidavit, private dealership service agreements, it shows that Eddie Napleton, starting in 2018, actually exercised control by managing the hiring and firing of managers, setting daily and weekly performance goals, investigating and disciplining misconduct. He testified that he was in charge of nearly every aspect of dealership operation nationwide. So that is part of the complaint, Your Honor, those allegations of his specific discrete control. But taken just a snapshot of the paragraph that uses oversight, I would have to concede that that alone would not establish his control. So also, the definition of associate in the SBA regulations, 2, Roman numeral 1, says an associate of a small business who is, the last one says key employee of the small business. How would you define key employee of the small business? It's a great question, Your Honor. I haven't seen any case that has actually wrestled with that definition, but the parties here actually agree that Eddie Napleton was not an employee of the borrower defendants. He was an employee of the corporate parent, Napleton Auto Group. So there's no argument that he actually falls in that category of key employee, but it is an undefined term. And the PPPs were filed by the individual dealerships? That's correct, Your Honor. Yes. There's a threshold problem here under Prong 1 that appellees have not wrestled with. The article mentions, again, roughly, says roughly 75 franchise dealerships, but it doesn't name any of the individuals. The courts interpreting the public disclosure bar have allowed inferences to be drawn, but this court in cause of action said that it must be the direct and logical conclusion. Appellees have to rely on at least four stacking inferences to get to an allegation of fraud. First, they have to infer that helps oversee means control. Then they have to infer that this control satisfies the associate status element. Then they have to infer that this control extends to the 37 dealership at issue here. Then they have to infer that all of these bits of information taken together lead to an inference of fraud. When you compare that to the kinds of disclosures that this court has seen, for example, in cause of action, there were government audits and letters from the attorney general's office that not only identified the specific actors, the time period, and the conduct, but even alleged wrongdoing. And the issue there was can we infer scienter? We know that they messed up. That's all in the public disclosures. We know who did it, when they did it, what they did. But is it negligence or is it fraud? And that was the simple inference that had to be drawn there. Here, appellees break this principle of inference by requiring them to stack on top of each other. And there's no analogous case that they've been able to point to that would allow that kind of inference stacking when there's equally plausible non-fraudulent inferences. Can we skip to the original source piece? Yes. I am interested in your observation that we are now out of step with the way many other circuits are looking at the materially-add language and what that really means. What other approach would you urge us to adopt and would you win under that other approach? I appreciate that question, Your Honor. I think both the Tenth and the Third Circuit have provided helpful insight into this. The Third Circuit has said that while there's not a hard and fast rule importing Rule 9b particularity into the analysis, that it's a helpful framework for analyzing whether there's a material addition. So they say, what aspects of the who, what, when, where, and how are missing from the public disclosure? And it's a balancing test, essentially. They say the more gaps that the relator is able to fill, the closer it is to materiality. Some of the courts use words like significant. Again, that is not a defined standard. The Tenth Circuit didn't refer to Rule 9b but had a similar framework, and they said the more gaps in information there are, the more room there is for a relator to materially add. Now, Repelli's argued here that the fraud is so simple that there really is no way to add anything of material value. But if the public disclosure material was evaluated under 9b, I can all but guarantee any court in this country would dismiss that. There's no specifics of when, there's no specifics of how, there's no specifics even that Eddie Napleton had any involvement with the 37 identified dealerships. Here, I mentioned earlier that the public disclosure bar allows inferences to be drawn, and it doesn't require an outright allegation of wrongdoing. However, every case that Repelli's relied on involved public disclosures that made allegations of wrongdoing, and at a bare minimum, regulatory noncompliance. Here, you don't have that. And the further that the public disclosures get from outright alleging fraud, the more space there is for a relator to materially add. By connecting previously unconnected information, by filling in the specifics that add particularity, that allow a complaint to survive a Rule 9b challenge. Would you like to reserve the meeting of your time? I would. Thank you, Your Honor. Okay. Thank you. All right. Mr. Nandy or Nandy? May it please the Court. My name is Neil Nandy, and I represent the defendant, Repelli's. The QTAM provisions of the False Claims Act represent a deliberate congressional balance. Private individuals called relators can bring lawsuits on behalf of the government with no government intervention and no case-specific government authorization. Those relators can then take a cut or a bounty from the recoveries in those suits. Congress authorized this procedure for one reason and one reason alone, to disclose fraud of which the government would otherwise be unaware. Congress also installed safeguards in the False Claims Act to eliminate lawsuits that were not serving that legislative purpose. One of those safeguards is the public disclosure bar, under which a court must dismiss a lawsuit if there are public disclosures that contain allegations or transactions that are substantially the same as the one in the lawsuit, unless the person bringing the lawsuit can show that they were an original source of that information, that they had knowledge that was independent of those allegations and that materially added to them. In this lawsuit, there are three inherent characteristics that make it impossible to avoid those three elements of the public disclosure bar. First, the theory of relator's case. Second, the nature of relator's allegations. And third, the nature of the relator itself. First, as to the theory of the case, relator is alleging that car dealerships applied for PPP loans despite being ineligible to do so. PPP loan fraud theories are inherently narrow. The PPP program only operated for a short period of time. It was one program. It was administered by the SBA. It had a defined set of eligibility criteria, and much of the information relating to the program was public. Who applied for loans, how much they received, the certifications they made, and the eligibility criteria. Here, relator's theory is that an individual that worked at the Napleton family car dealerships, Eddie Napleton, was an associate of those dealerships and was under felony indictment at the time of those applications. Many of these facts are indisputably public. The felony indictment, indisputably public. The applications, the certifications, all public. The only dispute is whether the public disclosures revealed Eddie Napleton's associate status. There are three ways one can be an associate under SBA rules. To be a director, officer, or key employee. To control the applicant, or to have a 20% ownership stake in the applicant. Relator, in the second amended complaint, refuses to commit to one of those three theories, which leads to the second inherent problem in this case. That's the nature of the allegations. The public disclosures here are traditional news media, the Palm Beach Post. It reveals that Eddie Napleton's family owns the dealerships. It reveals that he helps to oversee the operations of these Napleton dealerships, and it also reveals that he is the director of operations for the, quote, car empire. All Relator's second amended complaint does is explain what type of responsibilities a director of operations might have. Relator's allegations are subsumed within the public disclosures. Importantly, Relator argues that the public disclosures do not directly identify Eddie Napleton as an associate, nor does Relator's complaint. The associate status, that is a legal label. That's not something the court can credit under ITPL. It is simply a label that Relator attaches to the publicly disclosed facts and its inferences from that. But there is no direct evidence of associate status here. There is no email where someone says, oh, Eddie is an associate, we therefore can't apply for this. There is no document that Relator can point to that shows that the Napleton dealerships chose not to apply for something because of Eddie Napleton's associate status. There is no evidence whatsoever that anyone made any effort to conceal Eddie Napleton's roles at these dealerships so that they could apply for these loans. Relator's allegations are subsumed within the public disclosures and do not add facts that go to any element of the False Claims Act that is not already disclosed in the public disclosures. In response, Relator argues that the public disclosures don't identify wrongdoing. Again, no court has held that public disclosures must identify wrongdoing. Instead, this court's standards in the Glacier case says that the public disclosures must put the government in a position to investigate. In cause of action, this court stated that the disclosures must alert the government that fraud may be afoot. Speaking of common cause, can we skip ahead to the third element? I want to ask you the same question I asked Mr. Simpkins. Because common cause has been quite the subject of other circuits' exploration of this third prong of public disclosure. And so I'm wondering about our circuit's approach and whether we ought to rethink it. And what's your position on that and whether that enhances your position or not, where we just shift the way we think about materially ads and what that means. I do not, Your Honor, believe this court needs to revisit its precedent on that for a couple of reasons. First, the district court was not interpreting the Seventh Circuit's precedent as holding that substantially similar automatically means original source. We know this because, despite what Relator says, the district court gave Relator leave to amend its complaint solely to establish original source status. If substantially similar was always going to eat up the original source exception, the district court would not have given Relator leave to amend on that basis. Here, of course, Relator chose not to avail itself of that opportunity, which leads to the second problem, which is that this is just a bad vehicle to try to revisit that precedent because the Relator here cannot meet the standard under any court's precedent. We have looked, and under the current version of the public disclosure bar, we have found very few cases where an appellate court has held that a Relator's allegations were substantially the same as the public disclosures, yet that the Relator is still materially added. The only two examples we've been able to find are the Reed case in the Tenth Circuit and then the Moore case in the Third Circuit. Both of those are very different from here. First, in the Reed case, that was a situation where the Relator was a true corporate insider once more, had access to information that an outside Relator like this one simply cannot have access to, and that Relator was able to bring forward information that directly went to Sienter, that showed efforts to cover up and conceal the fraud. And that's an important thing that keeps coming up in these original source cases where there's evidence of Sienter through concealment. That's what happened in the Absher case in the Circuit. That's what happened in the O'Connor case as well, where the outside Relators were able to point to specific sham transactions designed to conceal the fraud, and therefore going to the element of Sienter. The Moore case as well included those types of fraudulent business transfers, fraudulent ownership situations, that again gave rise to clear evidence of Sienter that the public disclosures did not have. And one other note, Your Honor, on the Moore case, the third reason why I don't believe this Court needs to revisit its precedent, is because there is not unanimity in the Circuits as to what the standard should be. In fact, the Tenth Circuit in Reed said that the Third Circuit standard that Relator insists upon here, that that standard has the potential to allow the original source exception to completely swallow up the entire public disclosure bar. If this Court were to adopt the Third Circuit standard, it would be an outlier on the opposite end, and be embracing a standard that arguably does great harm to the statute. Returning to one of Relator's points, if it's okay with Your Honor, on the substantial similar point, Relator argued that none of the cases involved a public disclosure that didn't allege wrongdoing. That's not the case, Your Honors. First, in the Kellogg case, which the District Court relied on here, that was a PPP loan case brought by an outside corporate Relator, therefore has many similarities here. That was a case brought under the ineligibility requirement that an organization, an applicant, couldn't restrict membership for reasons other than capacity. In that case, it was a country club applicant. There were some articles that stated that it was exclusive. Of course, the word exclusive can mean lots of things, but the Court said that that was a sufficient public disclosure to set the government on the trail of investigating the fraud. Similarly, in the Osheroff case, it's an Eleventh Circuit case. Relator brushes that aside in a footnote. That involved two sets of public disclosures. The first was an earlier filed state court action, but the Eleventh Circuit could not consider that for many of the allegations in the case because under the amended public disclosure bar, state actions like that one did not qualify. So instead, the Osheroff Court applied the public disclosure bar based on marketing material and positive press about the organization, none of which actually raised any allegation of wrongdoing. So those cases, this would not be an outlier situation in terms of applying the public disclosure bar here. We'll also note, Your Honors, to the point that Judge Lee made earlier, Relator tries to contend that oversight does not equal control. This is an incorrect argument for two reasons. One, the standard of the public disclosure bar isn't that the public disclosures must meet 9b. You just must let the government know that fraud may be afoot, give the government a reason to investigate. Second, again, Relator's second amended complaint repeatedly alleges oversight. The first time Eddie Napleton's name, as Eddie Napleton appears in the complaint, is describing an oversight role. These are the bookends. This is the framing straight from their opening brief here. The way their topic sentence to describe their allegations, the SAC alleges starting in 2018, Eddie Napleton directly oversaw all the borrower defendants. That's page 35. The oversight allegation is based on Relator's complaint. That is why it's substantially similar. As to the original source exception, again, this is an outside corporate Relator. Very difficult for them to be able to muster facts that would avail itself of that exception. They never made the effort to do so in the district court, and even if they had been able to, the voluntary disclosure requirement under the original source exception would prevent that. We see evidence of the voluntary disclosure requirement in cause of action where the court said that cause of action had sent a letter to the government before filing suit asking the government to investigate. That was not based on the mandatory disclosure requirement. The voluntary disclosure requirement is freestanding and must be given its own force. If the panel has questions regarding any of the other arguments in this case or the 9B arguments, I'd be happy to address those. Otherwise, we respectfully ask that the panel affirm the judgment of the district court. All right. Thank you, Mr. Nandy. Mr. Simpkins for rebuttal. Your Honors, I'd like to start by noting that Apelles has now raised two new arguments here today that were not raised below. The first was raised at the end there regarding whether relators' disclosure of the factual material underpinning its complaint was voluntarily provided to the government. This was nowhere in the briefing below. This was nowhere discussed by the district court. There's no factual record establishing that. All we actually have is paragraph 8 of the complaint that says the complaint and disclosure material was turned over to the government prior to filing the complaint. That meets Rule 8. If they have a further objection on that, I'm sure it can be raised once discovery has been completed. The second new argument is that relators' factual support lacks any evidence of scienter. Scienter was an issue explicitly reserved by defendants in the lower court. When they briefed their motion to dismiss, they said that they are not addressing scienter and that that may come with later motions. So that's not an issue that has actually been briefed or argued in either court. I want to correct something that Apelles said. They mentioned the Kellogg case, which is the Southern District of California case that the district court found particularly relevant. There, the disclosure material included a news article, an expose, that explicitly said and listed about a dozen exclusive country clubs that were closed but accepting PPP money while still charging full dues. It was an article alleging wrongdoing. It was not some passive news saying, hey, look at this exclusive country club, that then you would have to make a large inferential leap that they've done something wrong. It was, as in all the other cases, something that hinted at fraud, something that actually put the government on the trail of fraud, which is not what we have here. Apelles started by saying that the False Claims Act has one purpose, and that's to alert the government of fraud. That is patently false. Both the Supreme Court and many circuits have noted there are multiple policies served by the False Claims Act. One of them is to encourage private prosecution by relators, not simply for whistleblowers to come forward and alert the government, but for them to actually take up the mantle because the government cannot prosecute all viable claims. The second prong, which we didn't really discuss, asked the court to compare the quantum and quality of the disclosure material to the factual allegations and determine whether they are substantially the same. That's the criteria that cause of action relied on, quantum and quality. The quality is significantly different here, and the quantum overlap is essentially zero. Thank you, Your Honor. Thank you. We will take the case under advisement.